**IN THE UNITED STATES DISTRICT COURT FOR
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

**MIGUEL A. RODRIGUEZ,**
*on behalf of himself and all others
similarly situated*,

                  **Plaintiffs,**

**v.**                                 Civil No. 1:14-cv-01142 (AJT/TRJ)

**EQUIFAX INFORMATION SERVICES,
LLC,**

                  **Defendant.**

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF HIS
MOTION FOR CLASS CERTIFICATION**

Plaintiff, Miguel A. Rodriguez, individually and on behalf of all other similarly situated individuals, by counsel, files this Reply Memorandum in Support of his Motion for Class Certification and states as follows:

## I.      OVERVIEW

Defendant Equifax Information Services, LLC's ("Equifax") opposition to class certification is primarily founded on two merits contentions: (1.) The Fair Credit Reporting Act ("FCRA") notices—that it concedes are mandated by 15 U.S.C. § 1681k(a)(1)—may be mailed to consumers anytime on the same day that the corresponding credit reports are furnished to the employer; and (2.) Even though Equifax does not retain any record of when it sent the subject notices, it has a "policy" to usually send them on the same calendar day of the corresponding credit reports. Defendant must prevail on both of these contentions—when it sends the notices and when it is required to send them.  Otherwise, there are no predominant individual issues.  There are no facts that render Plaintiff's claim materially atypical.

In his opposition to Defendant's summary judgment motion, Plaintiff has addressed Defendant's legal contentions regarding the meaning and application of the "at the time" and other textual components of § 1681k(a). He has also partly preempted and rebutted these in his opening memorandum and again here. As to the factual underpinning of Equifax's opposition, the Defendant does not offer a single instance—not one letter, one electronic print record, or a name of one consumer—that supports its argument that it ever sends the § 1681k(a)(1) notices on the same day of their corresponding reports. And it does not point to or reference any written support for its claim that such a policy requiring contemporaneous notice exists. Not in discovery. Not in support of its summary judgment motion. And not in opposition to class certification.[1] Instead, Defendant's primary opposition arguments against class certification are based on unsupported and purely theoretical obstacles. The facts and claims in this case are as suitable—more even—as in multiple other FCRA cases in which this Court (and others) found Rule 23(b)(3) certification appropriate.

---

[1] Defendant's current blurring and misstatement of the record as to its § 1681k(a)(1) compliance efforts or procedures is disconcertingly similar to the manner in which Equifax did the same on class certification in *Soutter v. Equifax Info. Servs., LLC*, No. 3:10CV107, 2015 WL 1787236, at *3 (E.D. Va. Apr. 15, 2015) and in the appeal that reversed the Court based almost entirely on the mischaracterized evidence. As Judge Payne recently explained:

> Subsequently developed evidence has shown that recitation to have been based on an inaccurate record respecting legally determinative distinctions.
> Indeed, the record now shows that, in *Soutter I* and *Soutter II,* Equifax blurred the critical difference between the manner in which it collects information about the *entry of judgments* and the manner in which it collects information about the *disposition of judgments.*

*Soutter v. Equifax Info. Servs., LLC*, No. 3:10CV107, 2015 WL 1787236, at *3 (E.D. Va. Apr. 15, 2015). In taking its recent Rule 23(f) petition for interlocutory appeal in that case, Equifax defended its earlier misstatements as no longer material to the then-narrowed class:

> Equifax regrets the confusion concerning this distinction between the circumstances surrounding the collection of these two types of public-records data. This issue is immaterial to this petition, because the recertification order narrowed the class to focus on a time period when LexisNexis had electronic access to disposition data, thus avoiding any issue about the effect of any difference in collection procedures, and—despite that narrowing—the recertification order is erroneous for the reasons set forth in this petition.

*Equifax Information Services, LLC,* Defendant-Appellant, v. *Donna K. Soutter*, for herself and on behalf of all similarly situated individuals, Plaintiffs-Appellees., Appeal No. 15-172, Dkt. No. 2 at n.1 (4th Cir. April 29, 2015) (Appellant Brief).

## II.     EQUIFAX'S FACTUAL DISPUTES IGNORE ITS OWN EVIDENCE

While some factual analysis must be made on class certification, "The Court's factual determinations should go only as far as necessary and no farther*." Soutter v. Equifax Info. Servs., LLC*, No. 3:10CV107, 2015 WL 1787236, at *5 (E.D. Va. Apr. 15, 2015).

Regardless, whether at this premature posture or on summary judgment, Defendant's asserted facts as to its own procedures and conduct bear little resemblance to the testimony and documentary evidence it disclosed and that was discovered in the case.  And its summary of facts as to Mr. Rodriguez ignores the Plaintiff's own factual detail.  (Dkt. No. 71, at 8-9).  For example, while the Equifax may have reported his bankruptcy correctly (Dkt. No. 79, at 3), Defendant inaccurately reported another public record—a civil judgment—that did not belong to Mr. Rodriguez. (Dkt. No. 71, at 9).

Though it is immaterial to the present motion[2], Equifax's assertion—or suggestion—that the inaccurate judgment (and even the bankruptcy) was irrelevant in his job and security clearance application is just plainly wrong.  After the consumer report was furnished to OPM, Mr. Rodriguez was interviewed by a security clearance investigator. Mr. Rodriguez was confronted by the security clearance investigator about two items in his Equifax report—the bankruptcy and a civil judgment by "Fireside"—that appeared in a section of the report entitled "Public Records." Mr. Rodriguez had no previous knowledge of the judgment. Exhibit 1, Pl.'s Supp. Obj. & Resps. to Def.'s First Set of Interrogs., Interrog. Nos. 8–11; Exhibit 2, Rodriguez Dep. Tr. at 64:23-25, 65-68; Exhibit 3, OPM FOIA Response at 100546. Mr. Rodriguez explained to the security clearance investigator that the Fireside judgment did not belong to him and further stated that he would pay it off if required to do so. *Id*. Mr. Rodriguez's security clearance was then not approved until December 2012

---

2  As addressed below and in opposition to Summary Judgment, Equifax's understanding of § 1681k(a) ignores the statutory text.

approximately two months after his interview. Exhibit 2, Rodriguez Dep. Tr. at 21:2-11. The security clearance investigator confirmed that these public records were material to Plaintiff's employment security clearance. Exhibit 3, OPM FOIA Response at 100547.

In its opposition, Equifax makes a series of unsupported or now discredited factual claims in this regard. It asserts that, "Equifax's practice was, in the vast majority of instances, to send these notices to consumers on the same business day on which the report was provided to OPM." (Dkt. No. 79 at 4). Instead, Equifax offered only two employees with any knowledge as to how Equifax could comply with § 1681k(a)(1). Of these, only one actually had personal knowledge[3] of what was done and how it was done—Michelle (Trudie) Ambrose. She testified in her deposition—certainly the most credible (not attorney-edited) variation of her testimony—that she does not have any idea if the letters she prints on a given day are connected to the reports issued that day or a previous day. Instead, she simply printed the file that was sent by Equifax's computer, stuffed these into open envelopes and put them in a mail drop cubicle down the hall to be picked up at some indeterminate time by someone she did not know.[4] Regardless, as Plaintiff has already established in his opening memorandum and in more detail still in opposing summary judgment, there is not only no evidence to support the claim that the subject notices ever were handed to the U.S. Postal Service on the day

---

[3] Ms. Rivera's deposition testimony confirms that she has no personal knowledge, let alone detailed understanding, to support the contention Equifax needs. Exhibit 4, Rivera Dep. at 61:4-13. In fact, Ms. Rivera has no personal knowledge of the actual process and mechanics of sending the notices since 2007. *Id*. at 14-19 ("April 2007 when our Equifax Houston office closed . . . was the last time that we actually printed -- or that I had involvement in printing those.").; *see also id*. at 61:20 – 62:5.

[4] *See, e.g*., Exhibit 5, Ambrose, Dep. Tr., at 21:19-25 ("Did you ever do anything to compare or check the consumer names in what you call PR letters against the credit reports that were provided overnight to OPM? A. No. Q. You received a file of just already formatted letters, right? A. That is what my job was, yes."); 19:3-7 ("Q. Did you maintain any record of when you would check off a particular file now that you have done the PR letter? A. No. Q. It was just whatever printed out, you would stuff? A. Correct."); 27:25- 28:8 ("Q. Is it true that you do not know you cannot testify as to whether or not these PR notices are sent at the time that the credit reports are furnished to OPM? A. I know when I did the PR letters, I know I did my job. I sent them to where they were supposed to be. What happened after that point, I do not know."); 25:12-18 ("Q. Do you know whether you ever send these consumer PR notices at the time the corresponding credit report is being sent to OPM? A. All I know I download when I get into the office and get them out the door. That's all I know."); 20:15-20, 21:13-16 ("Q. Would you be the person that put postage on the envelope? A. No. Q. Did you seal the envelopes? A. No. [...] Q. Why not? A. Because that is what the mail room does. Q. It would be picked up. Do you know who picked it up? A. No.")

4

the corresponding reports were furnished, but all of the actual evidence confirms that it is never done. (*See, e.g.*, Dkt. No. 71, at 6-8).

## III.    ARGUMENT

### A.    THE PROPOSED CLASS IS ASCERTAINABLE

#### 1.    The Class would be Appropriately Certified for the Period September 5, 2012 through May 31, 2013.

Equifax's first argument is that the proposed class definition—inclusive of September 4, 2012 through July 17, 2014—is overbroad because Defendant changed its § 1681k(a)(1) notice procedures beginning June 1, 2013. (Dkt. No. 79 at 9). However, Equifax employee testimony does not support the Defendant's suggestion that the timing of the FCRA notice letters ever changed. (*See* Dkt. No. 71 at 8 (citing Dkt. No. 71-1 at 16:22-25, 17:1-8 and Dkt. No. 71-3)).

Nevertheless, absent other legal bars, Equifax would concede the suitability of the class definition—or a subclass—if narrowed to the period beginning on September 5, 2012 and ending on May 31, 2013.   For the reasons already explained, if the Court accepts Equifax's contention, it should amend the class definition to the narrowed class period. (*See* Dkt. No. 71 at 10-11).

#### 2.    Plaintiff's Class is Ascertainable Because Equifax Never Mails a FCRA Notice Letter that Contained the Mandated Content.

Defendant concedes that at least as between September 2012 and May 2013 the content of the Equifax FCRA notices was uniform.   (Dkt. No. 79 at 17).   Plaintiff alleges that Equifax Information Services, LLC was never identified in any of these notices as the CRA that sent the notice and furnished the report.   The legal merit to this claim is addressed fully in the summary judgment briefing.  But for the present posture, Equifax does not argue (and cannot argue) that there is any obstacle or difficulty in ascertaining and identifying class members who received the Equifax FCRA notices with this same content.  This component alone is sufficient to resolve this motion as

the proposed class will be exactly the same whether the class is certified because of the timing issue or because of the content basis.

### 3.      Plaintiff's Class is Ascertainable Because Equifax Never Mails its FCRA Notices "At the Time" it furnishes its Employment Reports.

Equifax's argument as to ascertainability (and other elements) is that, "It will not be possible to determine who is a member of the proposed class without engaging in extensive individualized fact-finding. Equifax does not retain records detailing the exact date and time of a particular mailing." (Dkt. No. 79 at 11).  Other than two attorney-scripted paragraphs in Equifax declarations, both unsupported and entirely conclusionary, there is zero evidence that Equifax has ever generated, printed and mailed a single notice letter on the same day the corresponding credit report was furnished.  Instead, Equifax's strategy in the case is to demand that Plaintiff "prove a negative"— that he show that Equifax has never mailed (as opposed to electronically generated, printed or stuffed) a notice on the same day it furnished its employment report. There is a difference between the "absence of evidence" and "evidence of absence." Plaintiff is not relying upon the former. Instead, he has propounded and litigated discovery, obtained archived § 1681k(a)(1) notices and corresponding reports, deposed every material witness disclosed by Equifax, and litigated multiple discovery motions.  By all of that, Plaintiff has discovered evidence of absence or "negative evidence," rather than the reverse.  Rather than simply guess or presume that Equifax has not produced evidence and therefore it must not exist, Plaintiff has affirmatively discovered from Equifax that, in fact, it has no procedure to actually get these notices from computer to the U.S. Postal Service on the same day of the report.  The Court should fairly conclude that Equifax's failure

to produce any document or other tangible evidence to support its "same day" assertion is evidence that its production would have been unfavorable to Equifax.[5]

Further, Equifax's position also ignores the substantial evidence the Plaintiff has already discovered and cited to disprove the possibility that Equifax sends "same day" notices.  (*See* Dkt. No. 71 at 8; *see also* Pl.'s Mem. in Opp. to Def.'s Mot. For Summ. J.).

Beyond the "it could have been the same day" contention, Equifax's argument retreats when the actual text of § 1681k(a)(1) is considered.  Plaintiff argued in detail why the plain language in § 1681k(a)(1) ("at the time") must mean what it says—that the notices must be mailed "at the time" the reports are also sent. Equifax ridicules this as impractical:  How could it mail consumer notices when it electronically furnishes its reports in the middle of the night?  It calls an interpretation of the statute that reads "at the time" to mean "at the time" as "absurd."  (Dkt. No. 79 at 16).  But Defendant's position assumes a false construct.

First, Plaintiff does not argue that "at the time" does not mean "at the exact same moment." Instead, as offered in Plaintiff's opening memorandum, "at the time" merely means "together".  As Plaintiff explained – in the same process.  (*See* Dkt. No. 71 at 4-5).  Beyond timing, the undisputed evidence is that the Equifax notices letters are left to a less rigorous and separate process that always occurs after the OPM employment reports are long gone.  At the very least, these two processes are not "at the time" of one another; they are not together.

Second, Equifax also assumes as its given that it must furnish its reports in the middle of the night and do so by automated means.  It obviously does this for monetary purposes—it is cheaper to

---

[5]  "If a party fails to produce evidence that is under that party's control and reasonably available to that party and not reasonably available to the adverse party, then you may infer that the evidence is unfavorable to the party who could have produced it and did not." 3 Fed. Jury Prac. & Instr. § 104.26 (5th ed.), 3 Fed. Jury Prac. & Instr. § 104.26 (5th ed.). Rivera testified that whatever Equifax's § 1681k(a)(1) policy was, it was contained in a procedures manual titled, OPM MANUAL PROCESSING, IN FORCE since 2007.  Exhibit 4, Rivera Dep.  70:16-71:10.  Equifax has refused to produce this document in this case and does not even mention its contents in opposition to this motion.

generate the reports and furnish them by automated means; but it is apparently not cost effective to do so for the notices. It makes economic sense for Equifax to defer the letter process and to have it performed by an existing employee, an existing mail process, and during miscellaneous breaks in the other work being performed. But economically effective or not, Equifax could either wait to send the subject employment reports until it could or would also send the notices, or it could automate and speed the sending of the notices. As addressed on summary judgment, OPM does not require that Equifax furnish instant reports—under its contract, Equifax has at least 24 hours to do so. The asserted impediment to sending the FCRA notices at the time it sends its reports is not impossible to meet. Instead, Equifax has concluded that it believes full compliance to be economically impractical.[6] Plaintiff also addresses this factual reality more fully in his opposition to summary judgment.

As Equifax points out, the FCRA has been interpreted by the Federal Trade Commission in 2000 to permit the mailing of the § 1681k(a)(1) notices. Dkt. No. 79, at 16, n.6. And at that time, employment reports were also mailed. Requiring the consumer notice to be mailed at the same time the report was mailed was not only not "absurd", but was plainly sensible. Today, Equifax has automated the delivery of its employment credit reports and the FTC interpretation has expanded. It was these types of technology changes that formed the basis for the FTC's withdraw of the 2000 Commentary cited by Equifax and issuance of the updated opinion published in 2011. Federal Trade Commission, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT, July 2011 at 81 ("A CRA may use first class mail **or other reasonable means** to notify consumers that it is providing public record information for employment purposes under subsection (a)(1).")(emphasis added).

---

6 It also bears noting that Equifax makes money by selling its reports, while its FCRA compliance is all merely an expense—not a profit center.

Equifax is furnishing these reports under the governance of a statute that still demands that it furnish the consumer notice "at the time" it furnishes its reports. As the Seventh Circuit has recognized in an oft-cited FCRA decision (regarding a different question): "Maybe suits such as this will lead Congress to amend the Fair Credit Reporting Act; maybe not. While a statute remains on the books, however, it must be enforced rather than subverted." *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 954 (7th Cir. 2006). As Plaintiff details further in his opposition to summary judgment, Congress knew how to expand or contract a timing requirement. Various provisions set time limits by measure of days. Others use terms such as "reasonable" to provide practical flexibility. Section § 1681k(a)(1) is not one of these.

### 4.     "Likely to Have an Adverse Effect" is not an Idiosyncratic Trigger.

Equifax contends that § 1681k(a) includes a threshold that each consumer must idiosyncratically meet—he or she must prove that the report Equifax furnished was actually "likely to have an adverse effect" on the specific employment he or she was seeking. (Dkt. No. 79 at 12-13). Accordingly, so goes Equifax's argument, the Court would have to examine every putative class member on a case-by-case *post-hoc* basis to determine if the bankruptcy, civil judgment or tax lien Equifax reported had an actual effect on the specific consumer considered. If it did not, then after-the fact Equifax would be liberated from its *a priori* obligation to comply with § 1681k(a). This would present a predominant individualized issue. And it would render the class more difficult to ascertain.[7]

Equifax's contention is not supported by the statute's text.[8] The preface to §1681k(a) is not, as Equifax argues, a case-by-case application dependent upon what eventually happens to a

---

[7] Really, Rule 23(b)(3) predominance is the only correct contention. Class membership could still be ascertained through these individual inquiries,; it would just be sufficiently burdensome to threaten the advantages of prosecuting these claims in a class.

[8] Mr. Rodriguez's own circumstances prove that Equifax's basic factual assumption is also wrong. He was required to explain and overcome the public records in his Equifax credit report in order to obain his security clearance.

consumer's job application. Under Equifax's construction, liability is only established *after the subjective use* of a consumer report rather than on a consumer-reporting agency's status and conduct prior to and at the time of furnishing the report at issue.

The manner in which one of Equifax's particular customers choose to interpret or respond to a negative public record on a consumer's report—whether it denied the consumer the job, made the consumer submit more documentation, or disregarded the consumer altogether—does not change whether the public record information initially reported was of the nature or type that was "likely to have an adverse effect" on the consumer's employment.  The preface paragraph in FCRA Section 1681k(a) begins with unambiguous language outlining what type of companies are covered by this subsection of the FCRA:

> A consumer reporting agency which furnishes a consumer report for employment purposes and which for that purpose compiles and reports items of information on consumers which are matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment shall . . .

15 U.S.C. §1681k(a). The language sets forth two different elements necessary to trigger the section's governance: one transactional, one definitional.  The first element, demonstrated by the initial "which" clause, requires that the CRA must be furnishing a report in connection with a transaction involving employment purposes.  This element is transaction-specific (i.e., the furnishing a consumer report for a particular purpose) and applies regardless of the type of company involved.

The second element, found after the second "which" clause, defines the *type* of company that

---

Bankruptcies, civil judgments, and tax liens on an employment report are plainly "adverse" to an employment application, even if not dispositive.  It is nonsensical to believe that if comparing two applicants identical in all ways except one—one report containing a bankruptcy, civil suit, or tax lien—that the derogatory record would not be likely to have some adverse effect, however slight.  And the phrase is not "had an adverse effect" or "caused a denial of employment."  This is confirmed by the FCRA's own treatment of these public records as "adverse" and therefore subject to a restricted reporting period.  15 U.S.C. § 1681c(a); *see also* Federal Trade Commission, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT, July 2011 at 55-57 (discussing characterization of bankruptcies, judgments and liens as "adverse information that casts the consumer in a negative or unfavorable light.") available at https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf (last visited May 29, 2015).

is required to comply with this section.  This definitional element imposes compliance obligations on certain companies that *generally* compile and report items of information on consumers (i.e., not limited to the particular transaction at issue), which are matters of public record and are likely to have an adverse effect upon *a* hypothetical consumer's ability to obtain employment (as opposed to ***the*** specific consumer at issue).  Equifax rewords the text to allow its summary judgment argument, but in doing so impermissible changes the statute's meaning.  Defendant's text versus the actual statute is telling: "The FCRA obligates Equifax to provide § 1681k notice only when the public-records information in the report is 'likely to have an adverse effect **upon [the consumer's]** ability to obtain employment.'" (Dkt. 61 at 14 citing 15 U.S.C. § 1681k(a)(1)).  But the actual text of the statute states "likely to have an adverse effect **upon a consumer's** ability to obtain employment." While "the" (definite article) refers to the specific consumer, "a" (indefinite article) refers to an unspecific consumer.[9]  Congress certainly understood this as later in the same section, it switched from "a" to "the" in requiring that the "at the time" notice letter be sent to "the consumer."  15 U.S.C. § 1681k(a)(1).

Equifax's alternate interpretation is betrayed by other text in § 1681k(a).  If the second "which" clause was not a categorical description of the types of CRAs required to comply, and instead was a case-specific criteria, the clause wouldn't make sense.  For example, by its text, §

---

[9] As an online grammar source explains:

> English has two articles: *the* and *a/an*. *The* is used to refer to specific or particular nouns; *a/an* is used to modify non-specific or non-particular nouns. We call *the* the *definite* article and *a/an* the *indefinite* article.  […]
> "*A/an*" is used to refer to a *non-specific* or *non-particular* member of the group. For example, "I would like to go see a movie." Here, we're not talking about a *specific* movie. We're talking about *any* movie. There are many movies, and I want to see *any* movie. I don't have a specific one in mind.

The Purdue University Writing Lab and Purdue Online Writing Lab accessible at https://owl.english.purdue.edu/owl/resource/540/01/ (last visited May 29, 2015)(emphasis added).

1681k(a) would only be triggered for reports that contained multiple "items" of information.  15 U.S.C. § 1681k(a) (". . . and <u>reports items</u> of information on consumers which are matters of public record . . .") (emphasis added).  A single adverse public record would be insufficient to trigger the section. The section would then also contain superfluous and inconsistent language, as much of the multi-layered "which clause" structure would add nothing to the section's meaning.  For example, under Equifax's interpretation, the section would have more simply stated:  "A consumer reporting agency which furnishes a consumer report [that includes] matters of public record [] likely to have an adverse effect upon a consumer's ability to obtain employment shall […]" The remainder of the preface would be meaningless. Such an interpretation is not permitted in this Circuit. *Wilson v. Flaherty*, 689 F.3d 332, 337 (4th Cir. 2012) (rejecting proposed interpretation of statute that would effectively "read out" certain statutory language).

Further, Congress did not leave any uncertainty as to whether the judgments and liens Equifax furnishes are of the type of records governed by § 1681k(a), as it lists these categories as examples of triggering records in § 1681k(a)(2).

Equifax's reading is nonsensical for another reason. If Equifax's interpretation were correct, CRAs with potential governance by § 1681k(a) would have to await a *post hac* review to determine if a notice was required or if strict procedures needed to have been designed. The CRA could never know whether or not § 1681k(a) even applied to it until after it completed the conduct that could have violated the FCRA, a law with serious private and regulatory penalties.  From both a semantic and practical perspective, the "public record information likely to have an adverse effect" qualifier must refer to a certain, objective type or category of public record that is both discernible and knowable by the CRA <u>before it furnishes</u> the data.  The nature and type of public record data covered by section 1681k(a) cannot depend upon how it was used or interpreted subsequent to delivery by the CRA.  Otherwise, the CRA would have no way of knowing whether it was complying with the

law.  The statute would be unconstitutional on void for vagueness grounds (which no court has ever found and no defendant has ever argued).  A constitutionally valid statute gives actors covered by the statute reasonable notice of proscribed conduct. *Schliefer by Schliefer v. City of Charlottesville*, 159 F.3d 843, 853 (4th Cir. 2010). Such statutes provide adequate advance notice of what constitutes permissible behavior.  *Id.* (suggesting that a valid statute provides "prior warning" that conduct is prohibited).  The boundaries of permissible conduct set out in a valid statute "***do not require reference to later actions by a third party***."  *City of Chicago v. Morales*, 527 U.S. 41, 58-59 (1999)(emphasis added). As such, the "likely to have" qualifying language is presumed to communicate to CRAs a specific and knowable type of data (e.g., criminal records) so that CRAs can comply with that section before providing a report to a third party.

The phrase "likely to have an adverse effect" is differently stated than and can be contrasted with other FCRA provisions that require that the adverse public record actually be "used in whole or in part" in making the adverse decision.  *See, e.g.*, 15 U.S.C. §§1681b(b)(3),  1681m(a). An "adverse" effect is simply one that would be "unfavorable" or "in a contrary direction."[10] "The FCRA does not define adverse public record information, but it does mention certain types of information that, by implication, meet this standard:  'items of public records relating to arrests, indictments, convictions, suits, tax liens, and outstanding judgments.'" *Fair Credit Reporting*, 8th Ed., National Consumer Law Center, 2013.

Accordingly, class membership can be determined—ascertained—by simply reviewing the electronic credit reports Equifax has archived to examine whether or not the report contained an adverse public record.  This threshold is a simple "yes" versus "no" question. As this Court explained, "[T]his recourse to manual, member-by-member review [does not] render the inquiry

---

[10]  http://www.merriam-webster.com/dictionary/adverse (last viewed June 1, 2015).

"subjective." Here, most of the determinations are readily discernible and almost always binary: an individual was either listed as subject to a judgment or was not; this judgment was either recorded by Equifax or was not; Equifax either received a communication from the individual or did not; and so on." *Soutter*, 2015 WL 1787236, at *7.

## B.   PLAINTIFF HAS ESTABLISHED THE REQUIREMENTS OF RULE 23(b)(3).

### 1.   Class Questions Predominate Over Individual Questions.

Rule 23(a) "commonality" and Rule 23(b)(3) "predominance" are related, but yet distinct burdens.   *Soutter*, 2015 WL 1787236, at *25 ("Whether common questions predominate over individual questions "is a separate inquiry, distinct from the requirements found in Rule 23(a)." *Ealy,* 514 F. App'x at 305 (citing *Wal–Mart,* 131 S.Ct. at 2556).").   Ordinarily, the commonality argument is whether or not particular issues are common questions or individualized ones.   Equifax does that here.   But the "predominance" fight is different.   The question there is whether the case's common questions are sufficiently material to overwhelm the individual questions that necessarily arise (such as whether a credit report was furnished about a person; whether this occurred during the class period, etc.).   In its opposition, Equifax is really only arguing commonality problems, claiming that the issues presented by Plaintiff as common questions are in fact individualized.   (Dkt. No. 79 at 14-19).   That is not a "predominance" divide.   Plaintiff contends that the issues of liability are all common questions:   Does a Notice put in the U.S.P.S. mail a calendar day (or even work day) after the corresponding credit report is furnished constitute sending the notice "at the time" of the report?   Does the use of USOPM or USOPM Project Manager identify the Defendant as the sender and lawfully inform the consumer that the consumer reporting agency Equifax Information Services, LLC furnished a report to OPM?   Are such FCRA violations willful?   Defendant argues that they are not.   This is commonality.   Defendant's only predominance argument is that individual questions

win by default because there are no common questions to offset the minimal individualized ones. As the Court recently explained, "Equifax advances no discernible arguments distinguishing between the commonality and predominance inquiries. . . . Equifax is addressing predominance by doubling down on its commonality arguments. That strategy does not work." *Soutter*, 2015 WL 1787236, at *26.

Equifax argues that none of the common issues Mr. Rodriguez raises—(1) the timing issue; (2) the content issue; and (3) willfulness—are meaningful common questions. But in each instance, this claim depends upon the Court's acceptance of Defendant's incorrect view of the facts and law. As addressed above and on summary judgment, the timing issue is a common question if "at the time" means "at the time" instead of "within a reasonable time after." And if "at the time" means "within one day", then liability is still a common question because all of the actual evidence in the case establishes that the subject notices are not placed in the U.S.P.S. mail the day the corresponding reports are furnished. In all regards these are common questions—does "at the time" mean "at the time." Does "at the time" mean "within one day." Does Equifax have a procedure in place to generate, print, stuff, add postage to, seal and put into the U.S.P.S. mail the § 1681k(a)(1) notices on the same day the corresponding reports are furnished.

Similarly, as addressed above, the content question is plainly a uniform and common question. Defendant's argument is not that this issue varies amongst class members, but rather that it is "meritless." (Dkt. No. 79 at 17). But of course, whether the claim is "meritless" is the common question. The same is true for Equifax's opposition to "willfulness" as a common question. Plaintiff does not contend that Defendant's systematic failure to prioritize the mandated § 1681k(a)(1) consumer notices to the same degree as the selling of credit reports is a mere "glitch" or failure of an otherwise compliant process and procedure.

This Court has considered nearly the exact same arguments now made by Equifax when

previously made in 2007 by LexisNexis. *Williams v. LexisNexis Risk Mgmt. Inc.*, No. CIV A 306CV241, 2007 WL 2439463, at *6 (E.D. Va. Aug. 23, 2007). The Court rejected exactly the same "willfulness" predominance challenge because, "In the case of the § 1681k class, LexisNexis adopted a standard procedure not to send notices simultaneously with the access it gave to Plaintiffs' employers. The Plaintiffs' class allegations charge that these standard procedures violated the FCRA, and that, in adopting these procedures, LexisNexis willfully violated the FCRA. *Williams*, 2007 WL 2439463, at *6.[11]

This conclusion is consistent with the case law that has developed in this District and Circuit since *Williams*.   *See,* e.g., *Stillmock v. Weis Markets, Inc.*, 09-1632, 2010 WL 2621041 (4th Cir. 2010); *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 305 (4th Cir. 2013) (In *Stillmock*, "we recognized [in a FCRA case] that where 'the qualitatively overarching issue by far is the liability issue of the defendant's willfulness, and the purported class members were exposed to the same risk of harm every time the defendant violated the statute in the identical manner, the individual statutory damages issues are insufficient to defeat class certification under Rule 23(b)(3).'"); *Dreher*, 3:11-CV-00624-JAG, 2014 WL 2800766, at *2-3; *Milbourne*, 2014 WL 5529731, at *11; *Souter*, 2015 WL 1787236, at *28 ("[T]his Court relies upon the lessons of *Stillmock* and *Souter II* in finding that willfulness is a common—and qualitatively predominate—question.").[12]

    **2.**    **Class Treatment of the § 1681k(a)(1) Claims is Superiority to Individual Litigation.**

---

[11] Defendant also incorrectly asserts that, "The cases on which Mr. Rodriguez relies do not require simultaneous mailing of the § 1681k notice. Indeed, as indicated by the citation to the dockets of the cases, these cases are not "law" at all; not one of the cases on which Mr. Rodriguez relies was resolved on the merits, as each was settled before the district court determined the notice timing issue." (Dkt. No. 79 at 16, n.5). In fact, in *Williams v. LexisNexis Risk Mgmt. Inc.*, the Court considered the exact same "at the time" and willfulness arguments on summary judgment—"adopt[ion of] a standard procedure not to send notices simultaneously with the access it gave to Plaintiffs' employers." *Id.* Summary judgment was denied on the same day that the class was certified. *Id.*, Dkt. No. 48, 49.

[12] Each of these decisions also directly addressed and rejected Defendant's contention that statutory damages raised a predominant individualized issue or in any way impaired class certification.

The Rule 23(b)(3) "superiority" determination is made by considering a number of factors, all comparing class to individual treatment. *See* Fed. R. Civ. P. 23(b)(3) (These include, "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."); *see also Souter*, 2015 WL 1787236, at *30. Equifax does not consider any of these factors. Instead, it offers the same rejected FCRA-class-certification arguments that have been repeatedly rejected in this Court and Circuit.

Equifax contends that the lure of a statutory damage recovery, possible punitive damages, and attorney's fees would be sufficient to tempt would-be consumers to find an attorney and litigated an individual federal lawsuit. This argument was expressly rejected by the Fourth Circuit in the direct context of the FCRA. *Stillmock*, 385 F. App'x at 275.[13] As the Court recently rejected Defendant's same argument (and part of the same brief), "Notwithstanding Equifax's sundry citations to contrary holdings outside the Fourth Circuit, this Court is persuaded to follow in *Stillmock's* footsteps." *Souter*, 2015 WL 1787236, at *30.

There are multiple reasons to find class certification superior, each explained (and supported with appropriate and accurate authority) in Plaintiff's opening memorandum. (Dkt. No. 71 at 23-24). Equifax ignores most of these. It does however repeat the same "novel claim" argument it always makes, citing inapposite authority form an inapplicable fact pattern and claim. (Dkt. No. 79

---

[13] In contrast, Equifax inaccurately cites to *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 328 (4th Cir. 2006) claiming that the Court of Appeals "agreed with the District Court" when in fact, it merely noted that the District Court had so held. (Dkt. No. 79 at 22). It similarly omitted the next line that appellants did not "challenge these additional findings[.]" It's an academic point as every District and Fourth Circuit FCRA case has held as Plaintiff suggests. But the misuse of Thorn and the omission of governing authority directly on point is regrettable.

at 23). The Court has similarly rejected such a "hail Mary." *Soutter*, 2015 WL 1787236, at *31. Mr. Rodriguez's case demonstrates that the class-action mechanism constitutes a superior means of adjudicating the claims before the Court. Neither this Court nor class members would be better off with the mandated individual litigation of this claim.[14]

### C.   PLAINTIFF HAS ESTABLISHED THE REQUIREMENTS OF RULE 23(a).

### 1.   Plaintiff Satisfies Typicality.[15]

First, Plaintiff concedes that he cannot represent a post-May 2013 class. The class period that should be certified is only through May 2013.

Equifax also argues that Mr. Rodriguez's case is atypical because he testified that he did not recall receiving Defendant's notice letter. But Defendant's argument is based on the resolution of its expansion of "at the time" to comport with its "never simultaneously" or "never within less than a workday" notice printing and mailing procedure. If Equifax failed to send the class as a whole an "at the time" class notice, then there is no material difference between one class member and another. Receipt in three days, ten days, or no recall of receipt at all do not change the material facts that establish the violation. And even Defendant concedes, "Mr. Rodriguez is correct that the § 1681k inquiry focuses on Equifax's conduct, not his." (Dkt. No. 79 at 24). The violation is a failure to send the notice "at the time." And the violation is failing to send the notice content mandated by § 1681k(a)(1). As to the later, it would make no difference is the Defendant sent one class member a

---

[14] The same may not necessarily be true for Equifax. "'[T]here is a strong presumption in favor of a finding of superiority' where, as here, 'the alternative to a class action is likely to be no action at all for the majority of class members.' . . . [O]ne suspects that Equifax 'resists certification in an attempt to keep Plaintiffs with relatively small claims out of court altogether—precisely the problem the class action mechanism was designed to address.'" *Soutter*, 2015 WL 1787236, at *31 (citations omitted).

[15] Defendant also drops a short mention of its Article III standing argument in a footnote. (Dkt. No. 79 at 24, n.8). This is addressed on summary judgment. And it's wrong. *Dreher v. Experian Info. Solutions, Inc.*, No. 3:11-CV-624, 2014 WL 6834867, at *3 (E.D. Va. Dec. 3, 2014).

notice that listed "USOPM" and another a notice that substituted, "OPM."  Both violate the statute in the same manner for the same reasons.

Equifax also repeats its contention that the preface to § 1681k(a) should be reinterpreted to impose a case-by-case review to determine if an admittedly adverse public record reported by Equifax was "likely to have an adverse effect" on a specific job application.  Plaintiff has addressed this above and in his opposition to summary judgment.

### 2.  **Plaintiff Adequately Represents the Class**

Lastly, Equifax argues that Mr. Rodriguez is not an adequate class representative because he has "abandoned valuable actual damages."  This argument has been used repeatedly by Equifax.  It has also been repeatedly rejected by this Court :

> As to the adequacy of the class representative, Equifax renews its contention that Soutter is in conflict with the class because she has waived any claims to actual damages. . . . But, to put it plainly, "that dog won't hunt."
> "For a conflict of interest to defeat the adequacy requirement, 'that conflict must be fundamental.' " *Ward v. Dixie Nat. Life Ins. Co.,* 595 F.3d 164, 180 (4th Cir. 2010) (quoting *Gunnells v. Healthplan Servs., Inc.,* 348 F.3d 417, 430 (4th Cir. 2003)). "A conflict is not fundamental when ... all class members share common objectives and the same factual and legal positions and have the same interest in establishing the liability of [the defendant]. Moreover, a conflict will not defeat the adequacy requirement if it is merely speculative or hypothetical. . . . " *Id.* (citations and internal quotation marks omitted).
> . . . Soutter shares the same factual and legal positions as the class, has the same interest in establishing Equifax's liability, and is bound by her prior representations that she is not asserting an actual damages claim. Moreover, as the Court held previously, "[t]he conflict alleged by Equifax rests on the hypothetical and speculative prediction that there are numerous putative class members who would seek to litigate substantial actual damage claims." *Id.* Equifax has done nothing to shore up this contention on remand, and it remains true that any putative class members who wish to litigate actual damages retain the right to opt-out pursuant to Rule 23(c)(2).

*Soutter*, 2015 WL 1787236, at *24; *see also Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 432 (4th Cir. 2003) ("Rule 23(c)(2) permits members of a class maintained under section (b)(3) to opt out of the class, providing an option for those Plaintiffs who wish to pursue claims against TPCM

requiring more individualized inquiry. Thus, rhetoric aside, Plaintiffs with only direct claims are not being '[j]amm[ed],' 'sacrificed' or '"caught' in any class action against their will. *Post* at 463.") As Judge Easterbrook explained in a seminal FCRA class certification decision rejecting Defendant's argument: "That actual loss is small and hard to quantify is why statutes such as the Fair Credit Reporting Act provide for modest damages without proof of injury." *Murray*, 434 F.3d at 952-53.[16]

## IV.    CONCLUSION

The proposed class meets the requirements of Rule 23(a) as well as Rule 23(b)(3).  On this basis, the Plaintiff respectfully moves that the Court grant his Motion for Class Certification.

**MIGUEL A. RODRIGUEZ,** *on behalf of himself and all others similarly situated*


By: ____*/s/ Leonard A. Bennett*____
           Counsel

Leonard A. Bennett, Esq., VSB #37523
*Counsel for Plaintiff*
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, VA 23601
Telephone: 757-930-3660
Facsimile: 757-930-3662
lenbennett@clalegal.com

---

[16] In the (out of jurisdiction) cases upon which Defendant pins its argument, the district court determined that the plaintiffs had cognizable actual damages—a distinction with the present case.  Defendant's cited cases were all "accuracy" cases brought under a different section of the statute—one that is often a means to seek actual damages. *See e.g. Gardner v. Equifax Info. Servs., LLC*, 2007 WL 2261688, at *5 (D. Minn. 2007) (distinguishing and citing *Murray*, "[T]his Court finds that in the instant case, it is not clear '[t]hat actual loss is small and hard to quantify."); *Clark v. Experian Info. Solutions, Inc*., 2002 WL 2005709 (D.S.C. 2002) (finding from the evidence before it that the respective FCRA allegation—the erroneous reporting of a bankruptcy in the credit files of a "bankruptcy innocent" co-obligor—presented claims with provable actual damages.)

**Certificate of Service**

I hereby certify that on June 1, 2015, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the counsel who appear in the CM/ECF system:

John W. Montgomery, Jr., Esq.
Counsel for Equifax Information Services LLC
John W. Montgomery, Jr., Attorney, PLC
2116 Dabney Road, Suite A-1
Richmond, VA 23230
Telephone (804) 355-8744
Facsimile (804) 355-8748
Email: jmontgomery@jwm-law.com

Tony Love, Esq.
Counsel for Equifax Information Services LLC
King & Spalding LLP
1180 Peachtree Street NE
Atlanta, GA 30309-3521
Telephone: 404.572.2565
Facsimile: 404.572.5100
TLove@KSLAW.com

_____/s/ Leonard A. Bennett_____
Leonard A. Bennett, Esq., VSB #37523
*Counsel for Plaintiff*
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, VA 23601
Telephone: 757-930-3660
Facsimile: 757-930-3662
lenbennett@clalegal.com

21